THE SPERRY & HUTCHINSON COMPANY, a corporation, appellee, v. LEO A. HOEGH, Attorney General, et al., appellants, and STATE OF IOWA, intervenor-appellant.

No. 48475.

(Reported in 65 N.W.2d 410)

JULY 26, 1954.

Leo A. Hoegh, Attorney General, and Kent Emery, Assistant Attorney General, for appellants.

Brody, Parker, Miller, Roberts & Thoma and Emmert, James, Lindgren & Eller, all of Des Moines, for appellee.

Holliday, Miller, Myers, Stewart & McDowell, of Des Moines, for Iowa Pharmaceutical Association, Iowa Retail Hardware

Association, Iowa Retail Food Dealers Association, and Iowa Retail Jewelers Association, appearing amicus curiae.

Abramson & Myers, of Des Moines, and Matthew J. Levitt, of Minneapolis, Minnesota, for amicus curiae.

MULRONEY, J.—The central question presented by this appeal is the constitutionality of the gift enterprise statutes (sections 553.15 to 553.18, Code, 1950) as applied to plaintiff's trading stamp business. Section 553.15, Code, 1950, prohibits all "gift enterprises, as hereinafter defined" and section 553.16, Code, 1950, defines the term "gift enterprise" in one of the longest sentences in the Code, filled with abundant legal phraseology, to mean a scheme whereby a seller of merchandise would issue trading stamps to purchasers redeemable by someone other than the seller.* Section 553.17 provides for misdemeanor punishment for participants in or advertisers of the gift enterprise and the next section states the term "person" may be construed to mean "firm or corporation."

There is a short argument in appellee's brief that its operation was not a gift enterprise because its operation does not involve a gift, but rather a fixed obligation incurred in advance of the delivery of merchandise to the stamp saver. There is no merit in the argument. The legislature chose to cast its prohibition in the form of a definition statute by calling something a gift which in common understanding would not be a gift, but this is a proper and not uncommon way to legislate a prohibition and the statutory definition is controlling. The trial court held

---

*553.16 " 'Gift enterprise' defined. Whenever two or more persons enter into any contract arrangement or scheme, whereby for the purpose of inducing the public to purchase merchandise or other property of one of the parties to said scheme, any other party thereto, for a valuable consideration and as a part of such scheme, advertises and induces or attempts to induce the public to believe that he will give gifts, premiums, or prizes to persons purchasing such merchandise or other property of such party to said scheme, and that stamps or tickets will be given by the seller in connection with such sales entitling the purchaser of such property to receive such prizes or gifts from any other party to such scheme, the parties so undertaking and carrying out such scheme shall be deemed to be engaged in a 'gift enterprise', unless the articles or things so promised to be given as gifts or premiums with or on account of such purchases, shall be definitely described on such stamp or ticket and the character and value of such promised prize or gift fully made known to the purchaser of such merchandise or other property at the time of the sale thereof, and unless the right of the holder of such stamp or ticket to the gift or premium so promised becomes absolute upon the completion upon the delivery thereof without the holder being required to collect any specified number of other similar stamps or tickets and to present them for redemption together, and the right of the holder of such stamp or ticket to the prize or gift so offered is absolute, and does not depend on any chance, uncertainty, or contingency whatever."

plaintiff's operation was "squarely within the terms of the statutory definition" and we agree with this conclusion. The trial court went on to hold that the statute, section 553.16, Code, 1950, was unconstitutional because it violated sections 6 and 9, Article I of the Iowa Constitution and the Fourteenth Amendment to the Constitution of the United States. The defendants appeal.

A statement of the facts appearing in the evidence is necessary to an understanding of the contentions made. Both parties called a number of witnesses and introduced many exhibits. Officers and employees of the plaintiff-corporation and many of its licensees testified as to the general methods and extent of the company's operations. Plaintiff, a New Jersey corporation, is authorized to do business in Iowa, and in forty-six other states, and is presently doing business in forty-two states. It has done business in Iowa since 1909' and now has license contracts with more than a thousand retail merchants located in seventy-nine counties in this state.

Mechanically, plaintiff's plan works as follows: Plaintiff enters into a license agreement with retailers authorizing them to use its "Co-operative Cash Discount System." Plaintiff furnishes the licensee with S & H Green Trading Stamps at the rate of $14 or $15 for a pad of 5000 stamps and the licensee issues stamps to his customers at the rate of one stamp for each ten cents paid in cash or before the 15th of the next month after a retail purchase. The retail purchaser pastes the stamps in a book provided by plaintiff, and when the book is filled (1200 stamps) he takes it or sends it to one of plaintiff's redemption stations and exchanges it for merchandise. The evidence shows the merchandise in the redemption station is given an average retail price in terms of stamps, to give an average redemption value of $2.50 to a stamp book. Plaintiff furnishes its licensees with advertising material which they can use to show they use its plan, and catalogs which contain pictures and descriptions of merchandise for which the stamps can be redeemed, to be distributed without charge to the licensee's customers. Plaintiff has ten redemption stations in Iowa and three more were in the process of construction at the time of trial.

It was plaintiff's theory developed by its evidence that its plan was in practice a method of giving the familiar discount of

about 2% for cash purchases or payment made within a normal discount period. The arithmetic of this theory is that a filled stamp book represents $120 of purchases and the book has $2.50 redemption value, which is 2.08% of $120. The testimony recites the advantages that accrue to a retail merchant of cash over credit transactions, about which there can be little argument, such as (1) reduction of collection costs and bookkeeping expenses (2) reduction of delivery expenses, as cash is usually a carry business (3) reduction of bad debt losses (4) the saving of interest charges for capital borrowing, and (5) the merchant is able to take advantage of discounts available on wholesale purchases. Since some of plaintiff's licensees were engaged in a strictly cash business before adopting the system it was part of plaintiff's theory that the system gave them a promotion device which would reward their customers, in competition with other promotion devices (mostly drawings for prizes) quite prevalent in some industries. However it fairly appears from all of the testimony that one of the principal benefits to be derived by the merchant by adopting plaintiff's system is the increase in volume of business (ranging from 25 to 40 per cent under plaintiff's evidence) and the resulting increase in net profits for the increased volume causes little if any increase in fixed expenses.

The record shows plaintiff usually licenses merchants within specified areas (about 5 blocks) engaged in different types of businesses but there are four or five other stamp companies doing business similar to, and presumably in competition with, plaintiff in this state. One such company, the Gold Bond Stamp Company, has filed an amicus curiae brief on the side of the appellee in this case.

The evidence introduced by defendants was mainly directed to show plaintiff's system was not a "discount for cash" plan. Retailers testified as to the normal net profit in a cash business said to be about 2% in the food business, and the system therefore results in increasing the cost to the consumer, for the licensee who, prior to licensing was doing a strictly cash business in competition with other cash businesses, must increase his sale price to cover the cost of the stamps. In general it can be said defendants' evidence was designed to show, and did show, beyond a

shadow of a doubt, that plaintiff's system, by whatever name it is called, is a clear violation of the gift enterprise statutes.

I. The trial court held the system was a cash discount plan. There is much support for this holding. In Food and Grocery Bureau, Inc. v. Garfield, 20 Cal.2d 228, 232, 125 P.2d 3, 6 (decided 1942), the opinion states: "It is well settled by the decisions of this court, as well as those in other jurisdictions, that the practice of merchants in issuing trading stamps with the purchase of articles is merely a method of discounting bills in consideration for the immediate payment of cash. Ex parte Drexel, 147 Cal. 763, 82 P. 429, 2 L.R.A., N.S., 588, 3 Ann. Cas. 878; Ex parte West, 147 Cal. 774, 82 P. 434; Ex parte Hutchinson, C.C., 137 F. 950; Sperry & Hutchinson Co. v. Temple, C.C., 137 F. 992; Lawton v. Stewart Dry Goods Co., 197 Ky. 394, 247 S.W. 14, 26 A. L. R. 686; Hewin v. City of Atlanta, 121 Ga. 723, 49 S.E. 765, 67 L. R. A. 795, 2 Ann. Cas. 296; Sperry & Hutchinson Co. v. Mc Bride, 307 Mass. 408, 30 N.E.2d 269, 131 A. L. R. 1254; Winston v. Beeson, 135 N.C. 271, 47 S.E. 457, 65 L. R. A. 167; State v. Lothrops-Farnham Co., 84 N.H. 322, 150 A. 551; State v. Holtgreve, 58 Utah 563, 200 P. 894, 26 A. L. R. 696."

In Sperry & Hutchinson Co. v. Hudson, 190 Ore. 458, 465, 226 P.2d 501, 504 (decided 1951), the opinion states: "In the operation of plaintiff's system, merchandise sold to cash customers is at the regular, established retail prices, the purchaser paying for each article of merchandise the same price required to be paid by those buying on credit. Of course, the primary purpose of this discount system is to encourage cash transactions. It is unnecessary to detail the many advantages accruing to the merchant from cash dealings. To give a discount for cash payments is a long-established mercantile practice. The manufacturer allows such discount to the jobber and wholesaler, and the jobber and wholesaler, to the retailer. To pass this on to the customer of the retailer is but providing a benefit to him who, in the last analysis, pays all bills."

In Sperry & Hutchinson Co. v. Margetts, 15 N.J. 203, 207, 104 A.2d 310, 311 (No. A-94, decided April 5, 1954), the opinion states: "Plaintiff's 'cooperative discount system' is in aid of what has come to be the normal cash discount and the only practical means to that end where there are intermittent purchases in small

lots. Sperry & Hutchinson Co. v. McBride, 307 Mass. 408, 30 N.E.2d 269, 131 A. L. R. 1254 (Sup. Jud. Ct. 1940). Not long after the inception of the device, it was judicially assessed as 'merely one way of discounting bills in consideration for immediate payment in cash, which is a common practice of merchants, and is doubtless a popular method, and advantageous to all concerned, and it is not obnoxious to public policy.' Ex parte Hutchinson, 137 F. 949 (C. C. D. Wash. 1904). Although the business is now country-wide, there has been no change in mode or method that has materially altered this concept."

Many more cases could be cited but the above are typical of the statements contained in numerous opinions. Perhaps the question of whether the system is or is not a discount for cash plan is a little academic. We recognize the legislature could prohibit any plan inimical to public welfare no matter what the plan is called. The argument that it is in effect a cash discount plan is an argument against the law's constitutionality because it prohibits a common practice among merchants advantageous to all concerned. Sperry & Hutchinson Co. v. Margetts, supra.

The defendants argue it is not a cash discount plan because many licensees did an all-cash business, and therefore it could not be said the plan induced customers to pay cash rather than buy on credit. If the plan is a cash discount plan to merchants who did a cash and credit business it would not lose its character because the licensee did an all-cash business. As stated in Food and Grocery Bureau, Inc. v. Garfield, supra, where this same argument was advanced: "* * * the fact that the appellant conducts his business on an all-cash basis does not preclude him from giving a cash discount." (20 Cal.2d at page 233, page 7 of 125 P.2d.)

■■ II. It is admitted here, and universally held, that the legislature's authority to enact antitrading stamp laws is to be referred to what is commonly called the police power: the power of the legislature to enact regulations essential to the public safety, health and welfare. Courts do not attempt to define the limits of police power but the inquiry is whether the legislation bears some substantial relation to the object of public or general welfare. If it does not then it is a clear infringement of rights secured by fundamental law, but there is a presumption that the

statute is constitutional and the burden is on the one asserting it is not to establish the allegation.

During the past half century many states have enacted laws similar to our gift enterprise statutes. We will not discuss all of the cases where plaintiff, or other stamp companies doing a similar business, have assailed the gift enterprise statutes as unconstitutional, but our study of the cases convinces us that the overwhelming weight of authority is that such statutes as ours are unconstitutional as not being within the sphere of police power.

Our gift enterprise statutes were passed in 1909 and plaintiff was doing business here then. In October 1910 one of plaintiff's licensees was prosecuted under the gift enterprise statute in Wapello County District Court. In granting a directed verdict to the defendant at the close of the state's case, District Judge Eichelberger filed a written opinion holding the gift enterprise statutes unconstitutional. In this opinion Judge Eichelberger stated: "I base my decision largely on the well considered case of State v. Sperry & Hutchinson Co., 110 Minn. 378, 126 N.W. 120, 30 L. R. A., N.S., 966 (decided April, 1910) * * * I am compelled to follow the great weight of authority and hold that the statute under consideration [identical with the Iowa statute] is in violation of the Constitution * * *."

The state did not appeal this case and plaintiff and its several competitors continued to do business in this state until 1938 when prosecutions under the gift enterprise statutes were commenced against plaintiff's licensees in Webster County. Plaintiff sought, in the District Court of Webster County, and obtained, an injunction against the prosecutions of its licensees and again the decision was not appealed. So the case is one of first impression in this court but we deem it somewhat significant that for more than 45 years plaintiff has violated this statute and the officials charged with its enforcement have not interfered, except on the occasions mentioned. There is little doubt the officials accepted the district court decisions as correct and this is not surprising in view of the flood of authority in the decisions of other appellate courts to support such holdings.

III. The courts have quite generally held that antitrading stamp legislation is unconstitutional as not a proper exercise of

police power. Among the later cases so holding are: State ex rel. Simpson v. Sperry & Hutchinson Co., 110 Minn. 378, 126 N.W. 120, 30 L. R. A., N.S., 966; In re Opinion of the Justices, 226 Mass. 613, 115 N.E. 978 (1917); City of Denver v. United Cigar Stores Co., 68 Colo. 363, 189 P. 848 (1920); State v. Holtgreve, 58 Utah 563, 200 P. 894, 26 A. L. R. 696 (1921); Lawton v. Stewart Dry Goods Co., 197 Ky. 394, 247 S.W. 14, 26 A. L. R. 686, 687 (1923); State v. Lothrops-Farnham Co., 84 N.H. 322, 150 A. 551 (1930); Sperry & Hutchinson Co. v. Kent Prosecuting Attorney, 287 Mich. 555, 283 N.W. 686 (1939); People v. Victor, 287 Mich. 506, 283 N.W. 666, 124 A. L. R. 316 (1939); Sperry & Hutchinson Co. v. McBride, 307 Mass. 408, 30 N.E.2d 269, 131 A. L. R. 1254 (1940); Food and Grocery Bureau, Inc. v. Garfield, 20 Cal.2d 228, 125 P.2d 3 (1942); Sperry & Hutchinson Co. v. Hudson, 190 Ore. 458, 226 P.2d 501 (1951); Sperry & Hutchinson Co. v. Margetts, supra (1954).

In the above cases the decisions are generally based upon the broad ground that antitrading stamp laws constitute unnecessary restrictions on the right of contract; unwarranted interference with a natural right to attract custom; prohibit contractual relations which do not affect the public health or morals or welfare; and are not the proper exercise of police powers. The opinions in the cases cited above contain the citations to earlier cases on the same subject.

The defendants rely upon Rast v. Van Deman & Lewis Co., 240 U. S. 342, 36 S. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A 421, Ann. Cas. 1917B 455, Tanner v. Little, 240 U. S. 369, 36 S. Ct. 379, 60 L. Ed. 691, and Pitney v. State of Washington, 240 U. S. 387, 36 S. Ct. 385, 60 L. Ed. 703, all decided in 1916. In general these cases hold legislation relative to coupons and stamps is not unconstitutional under the Fourteenth Amendment to the United States Constitution. In the Rast case the opinion states the trading stamp plan may be thought of as "an appeal to cupidity [and] a lure to improvidence." The above opinions have been much criticized, but the federal courts have followed them and a few state courts have followed them. State v. Wilson, 101 Kan. 789, 168 P. 679, L. R. A. 1918B 374; State v. Crosby Bros. Mercantile Co., 103 Kan. 733, 176 P. 321; In re

Trading Stamp Cases, 166 Wis. 613, 166 N.W. 54, Ann. Cas. 1918D 707; Sperry & Hutchinson Co. v. Weigle, 169 Wis. 562, 173 N.W. 315; State v. J. M. Seney Co., 134 Md. 437, 107 A. 189.

A reading of the cases first cited in this division will show that the majority of state court opinions since the Rast case refuse to follow the reasoning of the federal cases. See particularly People v. Victor and Sperry & Hutchinson Co. v. McBride, both supra.

In Lawton v. Stewart Dry Goods Co., 197 Ky. 394, 397, 247 S.W. 14, 16, 26 A. L. R. 686, 694, Justice Clay speaking for the court answered the "appeal to cupidity [and] a lure to improvidence" argument in this forceful language: "In the first place it is said that the trading stamp or premium system encourages profligate and wasteful buying and operates as a lure to improvidence. As a matter of fact it is simply a convenient method of allowing a discount for cash. Therefore it encourages cash buying and operates as an incentive to prudence and economy. But let us assume that it is a lure to improvidence. Have we reached the point where the prohibition of every business that leads to improvidence may be regarded as a proper governmental function? Nothing is more alluring to the purchaser than an attractive advertisement or a beautiful show window, but can it be said that the merchant who employs such means to increase his profits may be put out of business because, perchance, someone may see the advertisement or look in the window and be induced to buy when he cannot afford to do so? If so, how far may the doctrine be carried? Why not prohibit all forms of advertising and the sale of all articles of luxury on the ground that they lead to extravagance? Why not require every merchant to restrict his stock to overalls or cotton dresses so as to reduce the 'lure' to a minimum?"

In our judgment the great weight of authority and the better reasoning supports the view that legislation which practically prohibits the use of trading stamps is not a constitutional exercise of the police power. But, for the purpose of this case we need not decide whether the legislature is without power constitutionally to prohibit the issuance and use of trading stamps.

■ IV.  Section 6, Article I, of the Constitution of the State of Iowa provides: "All laws of a general nature shall have a

uniform operation; the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." The gift enterprise statute is a prohibitory law with a criminal penalty for its violation. It is elementary that it is a law of general nature and unless it has uniform operation it violates the fundamental law. This constitutional provision is often called the "equality" provision and, under our system of free constitutional government, the courts have a high duty to see to it that legislation does not violate the equality of rights guaranteed by the Constitution. Uniformity of operation does not mean that the law must operate alike upon every citizen. A law is uniform if it operates alike upon all within a reasonable classification. If the classification is not reasonable, but instead is arbitrary, then there are others, who are outside the arbitrary classification, upon whom the law does not operate, and the law is unconstitutional as not uniform in operation. So under the equality clause the inquiry is whether the classification embraced in the gift enterprise law is uniform or arbitrary.

We said in State ex rel. Welsh v. Darling, 216 Iowa 553, 555, 246 N.W. 390, 391, 88 A. L. R. 218, 222: "Classification, to meet the requirements of the Constitution, must be based upon something substantial—something which distinguishes one class from another in such a way as to suggest the reasonable necessity for legislation based upon such classification."

▮▮ Our gift enterprise statutes do not prohibit or interfere with the use of trading stamps generally. They only attempt to do so with such as are not furnished and redeemed by the merchant issuing them. Even if we assume antitrading stamp legislation can be sustained under police powers, to protect public morals and promote general welfare, how can it be said there is any basis at all for classification in the use of trading stamps between merchants who furnish and redeem their own and those who obtain their stamps from another who agrees to redeem them? One of the merchants in this case testified he furnished and redeemed his own trading stamps for about ten years and then changed to plaintiff's stamps as he "was looking for something that would be * * * cheaper and easier to handle." After the change to a licensee of plaintiff he noticed it was more "at-

tractive" to his customers as they had "a wider selection of merchandise." How can it be argued the public welfare and morals did not suffer when he issued his own stamps, but were impaired when he made arrangement for plaintiff to redeem the stamps he furnished? The classification must have a reasonable relation to the purposes and objects of the law. Here a study of the many cases previously cited where the issue was decided under police powers generally will present the composite picture of the general purpose and objects of the law. The arguments that seek to sustain the law list the general evils that trading stamp systems foster. They are: the lure to improvidence and wasteful buying, and the opportunity for fraud. Obviously these general evils, if they do exist, would not be stamped out by prohibiting stamp redemption by other than the issuing merchant. Two other so-called evils are sometimes argued as peculiar to the stamp company system. They are: the system introduces a middleman who receives a profit, and the system gives opportunity for coercion in that merchants are compelled to enter the system in order to compete with their rivals. The avowed purpose, to protect the public morals and general welfare by prohibiting the so-called "trade stamp" evil, will not support legislation based on who redeems the stamps. If it be bad for the public for a merchant to give stamps with retail purchases which can be redeemed for goods, it is just as deleterious to the public, no matter who is the redemptioner. The legislature has no general power to pass laws dispensing with a "middleman." If this were so it could pass laws dispensing with agents, factors, brokers, commission merchants, wholesale merchants, and jobbers.

The opportunity for coercion that the stamp company system is able to exert is about the same form of coercion followed by business houses generally. It is not unlike the coercion exercised by a wholesaler seeking to get a retailer to handle his line on the ground that a competitor of his is handling the same line. This record shows no one stamp company enjoys a monopoly. Plaintiff may be the largest and most publicized today but it has competitors. One of the merchants here testified his decision to adopt the S & H plan "may be compared to a decision to purchase a line of canned goods, or a line of frozen foods, or other identifiable brands of other merchandise or service, that the S & H plan

was a well-known plan, it had acceptance in other parts of the country."

A bare inspection of the gift enterprise statutes shows the classification that singles out the stamp company plan for prohibition has only arbitrary relation to any conceivable purpose of the legislation. Indeed it would seem the public welfare would be better served by a company plan with wide acceptance in many states—especially in the filling station business where there is much tourist trade—over an issuing and redeeming merchant plan.

The great weight of authority is against the validity of such statutes, under the equality provisions of Constitutions. The general rule stated in 16 C. J. S., Constitutional Law, section 511h, page 1027, is: "Equal protection of the laws is denied by statutes forbidding the use of trading stamps or the issuance thereof except by manufacturers or merchants redeeming them * * *."

In State v. Dalton, 22 R. I. 77, 85, 46 A. 234, 237, 48 L. R. A. 775, 84 Am. St. Rep. 818, the statute was somewhat like ours in that it recognized the right of the merchant to give away an article as an inducement to a sale but provided the merchant must give the article himself and not through a third person. In holding the statute unconstitutional the court stated: "This is equivalent to declaring that it is illegal for a man to give away one article as a premium to the buyer for having purchased another. For * * * it can make no possible difference that the article given away with the sale is delivered to the purchaser by a third person instead of the seller himself."

In People ex rel. Madden v. Dycker, 72 App. Div. 308, 314, 76 N. Y. S. 111, 115, the statute was like ours and in holding it unconstitutional and the conviction of a violator void the court cited earlier New York decisions and quoted from State v. Dalton, supra, and stated: "The prohibitive part of section 384p [335a] aims at the practice of issuing trading stamps that are to be redeemed by any person other than the merchant who distributes them * * *. Just what there is in the thing prohibited, differing from the thing expressly authorized, that makes it inimical to the public welfare and general safety does not appear."

A later New York decision, People ex rel. Appel v. Zimmer-

man, 102 App. Div. 103, 111, 92 N. Y. S. 497, 502, struck down a similar law, stating: "There is another infirmity in the statute which we apprehend renders it invalid.* * * The vice it seems is not in alluring one to buy by promise of a gift, but in permitting the promise to be fulfilled by another than the seller. It is a narrow ledge for the distinction to rest upon when in one instance the transaction is subject to legislative control to the extent of confiscation, while in the other it goes without let or hindrance. If the seller, by arrangement with a responsible company, secures the performance of the agreement and the arrangement is satisfactory to the buyer, it would seem that such a plan ought not to be made a crime, while redemption by the merchant or manufacturer is deemed an honest transaction. The statute is not founded on the moral plane pretended, but belongs to that class of legislation designed to drive out of business a successful competitor."

In State v. Dodge, 76 Vt. 197, 203, 56 A. 983, 984, 1 Ann. Cas. 47, a conviction under an antitrading stamp law was reversed on the ground the statute was unconstitutional. The opinion points out the statute only prohibits the retailer from giving stamps entitling the purchaser to receive property from a third person, while the seller was at liberty to give stamps redeemable by himself, and the opinion holds: "In principle, there is no substantial difference in the two methods. They both accomplish the same results * * *."

In In re Opinion of the Justices, 226 Mass. 613, 616, 115 N.E. 978, the opinion of the Justices was asked on the constitutionality of laws which "declare trading stamps redeemable by the vendor alone, to be legal, and those redeemable by anyone other than the vendor to be illegal." The answer was in the negative, the opinion stating: "We are of the opinion that no such distinction can be made under the Constitution."

In People ex rel. Attorney General v. Sperry & Hutchinson Co., 197 Mich. 532, 540, 164 N.W. 503, 505, L. R. A. 1918A 797, the court declared unconstitutional an Act of the same character as ours, the opinion stating: "So long as the use of trading stamps by dealers to draw custom is countenanced and sustained as a lawful practice, it is difficult to discern any difference, in principle, whether in consummation of the transaction the mer-

chant who negotiates it, and issues to his customers such 'lure to improvidence' under a guaranty of redeemable value, redeems the stamp himself or has someone redeem it for him."

In State v. Holtgreve, 58 Utah 563, 575, 200 P. 894, 898, 26 A. L. R. 696, 705, the law imposed a tax upon the use of trading stamps purchased from others, while permitting him to issue them without tax when he furnished them himself. In holding the law unconstitutional on the ground it was discriminatory and an improper classification, the opinion cites and quotes extensively from a number of opinions, and holds: "If, now, we apply the doctrine of classification to the stipulated facts in this case, how can it reasonably be contended that there is a basis for classification in the use of trading stamps between a merchant who furnishes, uses, and redeems his own stamps and the merchant engaged in the same business who obtains his trading stamps from another who has agreed to redeem them upon the order of the latter merchant? The only difference between the transactions is that the merchant first named redeems the stamps issued by him by delivering to his customers the agreed value thereof as a discount for cash purchases, while the merchant last named enters into an agreement with another that such other shall redeem the stamps upon his order by paying the customer the agreed cash value thereof or by delivering to him some article or articles of merchandise of his own choosing which are of the value represented by the stamps. In either case the legal and moral effect of the transaction is precisely the same. In both cases the customer receives the discount that the merchant agreed to allow him for cash purchases, nothing more, nothing less. There is, therefore, no basis for a distinction or classification, but the classification, if one be made, is purely fanciful, capricious, and artificial."

Many more cases to the same effect could be cited and most all of the opinions we quote from above contain the citations to many other opinions of similar import. As against all of the authorities cited the defendants cite two cases, State v. J. M. Seney Co., 134 Md. 437, 107 A. 189, and State v. Wilson, 101 Kan. 789, 168 P. 679, L. R. A. 1918B 374. From our study of these two cases it would appear that they would sustain plaintiff's

position. But they definitely set forth a minority rule. Of the Wilson case it was said in State v. Holtgreve, supra, at page 577 of 58 Utah, page 899 of 200 P., page 706 of 26 A. L. R.:

"It must be conceded, however, that in the decision of State v. Wilson, supra, the Supreme Court of Kansas holds that the Legislature is authorized to classify the use of trading stamps so as to prohibit the use of the company's trading stamps while permitting the use of all stamps that are issued and redeemed by the merchants issuing them. The decision is, however, contrary to practically every other decision upon the subject, and does not commend itself to our judgment. If that decision be followed to its logical conclusion, then there would be, there could be, no difference or distinction, however trivial, that would not be a sufficient basis for legislative classification. Under such a holding the constitutional provision requiring that all laws shall be given uniform operation whenever possible would be completely ignored by the courts, and the Legislature might disregard it with impunity."

Of course it is always presumed that all Acts of the legislature are passed in utmost good faith and also that they are conformable to the Constitution. And it is not until the unconstitutionality of a given Act is plainly made to appear that the Court is called upon to declare it void. But after indulging every possible presumption and intendment in favor of the validity of a statute, and being unable to find that it can be sustained as a constitutional exercise of legislative power, it becomes the duty of the court to declare it void. Our obligation not to interfere with the legislature's right to pass laws is no higher than our obligation to protect the citizens from discriminatory class legislation violative of the constitutional guaranty of equality of all before the law. If the use of trading stamps is inimical to public welfare, and it is proper to regulate or prohibit their use, then there should be no exceptions if the constitutional command of "uniform operation" is to be observed.

We are constrained to agree with the learned trial court, as well as with the majority of the courts of the country, and hold the classification made in the gift enterprise statutes is clearly

arbitrary and not sanctioned by our Constitution. The judgment of the trial court is affirmed.—Affirmed.

BLISS, OLIVER, SMITH, WENNERSTRUM, and HAYS, JJ., concur.

GARFIELD, C.J., and THOMPSON and LARSON, JJ., dissent.

GARFIELD, C.J., (dissenting)—I respectfully dissent.

I. The majority refers to "the flood of authority" it says supports its view that Code sections 553.15 to 553.18 are not within the sphere of the police power and therefore violate due process of law. A dozen cases are cited at the beginning of its Division III as so holding. Many of the decisions cited for this and other propositions are not authority therefor.

For example, the latest of the dozen citations is Sperry & Hutchinson Co. v. Margetts, 15 N. J. 203, 104 A.2d 310. The majority cites it three times. *It does not even consider any constitutional question.* This is also true of Sperry & Hutchinson Co. v. Hudson, 190 Ore. 458, 226 P.2d 501, which holds merely plaintiff's stamp plan does not violate the state Blue Sky law, principally because trading stamps are not "securities" as defined by the law; Food and Grocery Bureau, Inc. v. Garfield, 20 Cal.2d 228, 125 P.2d 3, which holds only that giving trading stamps does not violate the state Unfair Practices Act—there was no claim "the legislature is without power constitutionally to prohibit the issuance and use of trading stamps, and it may be noted, the United States Supreme Court has sustained the validity of anti-trading stamp legislation." (Page 232 of 20 Cal.2d, page 5 of 125 P.2d)

Another of the majority's citations, to which particular attention is directed, People v. Victor, 287 Mich. 506, 283 N.W. 666, 124 A. L. R. 316, involves a statute prohibiting dealers in bakery and petroleum products from giving away any commodity to promote the sale of any other commodity. Defendant was convicted under the statute for giving away with the sale of five gallons of gasoline a drinking glass worth less than five cents. A majority of the court held the law violated due process. The Michigan statute is not similar to ours. What was done there

would not violate our law and what plaintiff does here would not violate the Michigan statute. Sperry & Hutchinson Co. v. Kent Prosecuting Attorney, 287 Mich. 555, 283 N.W. 686, follows People v. Victor, supra, and *also rejects the claim the Michigan statute* (applicable only to dealers in bakery and petroleum products) *violates the 14th amendment in denying equal protection of the laws.*

The other case the majority particularly commends in its Division III is Sperry & Hutchinson Co. v. McBride, 307 Mass. 408, 30 N.E.2d 269, 131 A. L. R. 1254, involving a statute requiring dealers in motor fuels to post prices on each fuel pump to remain in effect at least twenty-four hours and prohibiting the giving of premiums or rebates so as to permit a purchase at a net price below the posted price. Both requirements of the statute were held to be an invalid exercise of the police power. The decision conflicts with State v. Woitha, 227 Iowa 1, 287 N.W. 99, 123 A. L. R. 884, State v. Hardy, 227 Iowa 12, 287 N.W. 104, and Ed Schuster & Co. v. Steffes, 237 Wis. 41, 295 N.W. 737, 133 A. L. R. 1071. In any event it is not in point here. City of Denver v. United Cigar Stores Co., 68 Colo. 363, 189 P. 848, cited by the majority, is a mere memorandum decision involving the validity of a city ordinance prohibiting issuance of trading stamps and gifts of like character.

Although the majority seems to feel plaintiff's plan is simply a cash discount system and our statute is an improper exercise of the police power in violation of due process, its decision is confined to the point that the law violates the equality and uniformity provision (section 6, Article I) of the Iowa Constitution and presumably the equal protection clause (section 1, 14th Amendment) to the United States Constitution. Seven decisions of many said to be to the same effect are cited in the majority's Division IV to support this holding.

Two of these decisions, State v. Dalton (1900), 22 R. I. 77, 46 A. 234, 48 L.R.A. 775, 84 Am. St. Rep. 818, and State v. Dodge (1903), 76 Vt. 197, 56 A. 983, 1 Ann. Cas. 47, *do not even consider the question of uniformity or class legislation* but hold merely the statutes there considered were not valid police measures because they did not promote the public health, safety or morals and therefore violated the due process clause of the 14th

Amendment. In State v. Dodge this is the only constitutional provision it was claimed the statute violated.

Further, State v. Dalton, supra, says the court does not differ from the condemnation of the trading stamp business described in Lansburgh v. District of Columbia, 11 App. D.C. 512 (the Sperry & Hutchinson plan) and again, " * * * we do not approve of the trading-stamp business as some of the cases above referred to inform us it is conducted, * * * *nor do we decide that it is not competent for the General Assembly to prohibit it.*" (Emphasis added.) See page 92 of 22 R. I., page 239 of 46 A.

Such a decision as in the Dalton and Dodge cases could not have been reached since 1916 when Rast v. Van Deman & Lewis Co., 240 U. S. 342, 36 S. Ct. 370, 60 L. Ed. 679, L. R. A. 1917A 421, Ann. Cas. 1917B 455, Tanner v. Little, 240 U. S. 369, 36 S. Ct. 379, 60 L. Ed. 691, and Pitney v. State of Washington, 240 U. S. 387, 36 S. Ct. 385, 60 L. Ed. 703, were decided. As plaintiff concedes, decisions of the United States Supreme Court on matters relating to the Federal Constitution are binding on state courts. See State Tax Commission v. General Trading Co., 233 Iowa 877, 886, 10 N.W.2d 659, 664, 153 A. L. R. 602; Elk River Coal & Lbr. Co. v. Funk, 222 Iowa 1222, 1232, 271 N.W. 204, 110 A. L. R. 1415; Tolerton & Warfield Co. v. Iowa State Board of Assessment and Review, 222 Iowa 908, 911, 270 N.W. 427; American Asphalt Roof Corp. v. Shankland, 205 Iowa 862, 864, 219 N.W. 28, 60 A. L. R. 986, and citations; 21 C. J. S., Courts, section 206; 11 Am. Jur., Constitutional Law, section 104.

Further, decisions of fifty years ago such as State v. Dalton and State v. Dodge, both supra, People ex rel. Madden v. Dycker (1902), 72 App. Div. 308, 76 N.Y.S. 111, and People ex rel. Appel v. Zimmerman (1905), 102 App. Div. 103, 92 N.Y.S. 497 (others of the seven decisions the majority cites in its Division IV for its holding of lack of uniformity of our statute) when the police power was thought to be limited to measures that promote merely the public health, safety or morals are no longer authoritative. The scope of the police power is now universally recognized as much less restricted. It has long been held to include also at least the promotion of the general welfare, prosperity, comfort and convenience.

See Benschoter v. Hakes (Mulroney, J.), 232 Iowa 1354, 1362, 8 N.W.2d 481, 486; State v. Woitha, supra, 227 Iowa 1, 7, 8, 287 N.W. 99, 123 A. L. R. 884 ("'What was at one time regarded as an improper exercise of the police power may now * * * be recognized as a legitimate exercise of that power.'"); City of Des Moines v. Manhattan Oil Co., 193 Iowa 1096, 1104, 184 N.W. 823, 827, 188 N.W. 921, 23 A. L. R. 1322; Chicago, B. & Q. Ry. Co. v. People of Illinois ex rel. Grimwood, 200 U. S. 561, 592, 26 S. Ct. 341, 50 L. Ed. 596, 609, 4 Ann. Cas. 1175; State v. Pitney, 79 Wash. 608, 140 P. 918, Ann. Cas. 1916A 209, 210; State ex rel. Hughes v. Cleveland, 47 N.M. 230, 141 P.2d 192, 200; 11 Am. Jur., Constitutional Law, section 253, page 982 ("It is obvious that the tendency is to extend rather than to restrict the police power. * * * The state may, in the exercise of the power, declare an act or conduct invalid or unlawful which has theretofore been regarded as valid.").

The United States Supreme Court has repeatedly approved the statement "The police power is not subject to any definite limitations, but is coextensive with the necessities of the case and the safeguard of the public interests." See for example Camfield v. United States, 167 U. S. 518, 524, 17 S. Ct. 864, 866, 42 L. Ed. 260, 262; Tanner v. Little, supra, 240 U. S. 369, 386, 36 S. Ct. 379, 60 L. Ed. 691, 703. Again, "the police power extends to all the great public needs." Camfield v. United States, supra; Noble State Bank v. Haskell, 219 U. S. 104, 111, 31 S. Ct. 186, 188, 55 L. Ed. 112, 116, 32 L. R. A., N.S., 1062, Ann. Cas. 1912A 487.

Further, in State v. Dalton and State v. Dodge, both supra, as in People ex rel. Madden v. Dycker, supra, and several other early cases, perhaps the main question considered is whether the trading stamp device was a lottery. Much of the discussion in the three last cited decisions and others is of that question. This is also true of State ex rel. Simpson v. Sperry & Hutchinson Co. (1910), 110 Minn. 378, 126 N.W. 120, 30 L. R. A., N.S., 966, cited at the beginning of the majority's Division III.

In re Opinion of the Justices (1917), 226 Mass. 613, 617, 115 N.E. 978, 979, cited in the majority's Division IV, is based in part upon the holding that a previous decision in a cause between parties will not be overruled in an advisory opinion but "only after argument in another cause between party and party * * *."

In People ex rel. Attorney General v. Sperry & Hutchinson Co., 197 Mich. 532, 164 N.W. 503, L. R. A. 1918A 797, also cited by the majority, the distinction sought to be made in the statute between merchants and manufacturers was much narrower than in our law and the decision is based in part upon a defect in the title of the statute. Then too the court seems to have fallen into the error of assuming that the exercise of the police power was limited to what protects the "public morals, health and safety for the general good." (Page 537 of 197 Mich., page 504 of 164 N.W.) This is the case cited in 16 C. J. S., Constitutional Law, section 511h, page 1027, as authority for the statement that equal protection is denied by statutes forbidding issuance of trading stamps except by dealers redeeming them.

II. I am not so credulous as to agree the elaborate plan plaintiff calls its "co-operative cash discount system" is a mere cash discount plan. Plaintiff's licensing agreement expressly permits dealers to issue as many stamps where credit is extended to the 15th of the following month as for cash sales and it contains no express prohibition against giving stamps for payment of bills of longer standing. Further, it appears plaintiff acquiesces in "double stamp days" when twice the usual number of stamps is given with purchases. It is not suggested there is a "familiar discount" of about four per cent for purchases for cash or on credit up to forty-five days.

Dealers pay plaintiff $3 a thousand for the stamps, "license" and "services"—$3.60 for the 1200 stamps to fill a single book. For this cost of $3.60 to dealers the customer, if he saves the stamps and presents them for redemption, is supposed to get merchandise of an average retail value of $2.50. Dealers also must pay for the large number of stamps given out that are never presented for redemption for which plaintiff parts with no merchandise.

If plaintiff's plan is a mere discount for cash it would seem dealers are unwise to pay so much for so little. The obvious fact is that plaintiff's plan is a promotion scheme designed to induce the public to purchase merchandise from its dealers exclusively and it appears plaintiff's agents so represent the plan to prospective licensees. As said in Tanner v. Little, supra, 240 U. S.

369, 384, 36 S. Ct. 379, 384, 60 L. Ed. 691, 702: "There must, therefore, be something more in it than the giving of discounts, something more than the mere laudation of wares. If companies * * * are able to reap a profit from it, it may well be thought there is something in it which is masked from the common eye and that the purchaser at retail is made to believe that he can get more out of the fund than he has put into it, something of value which is not offset in the prices or quality of the articles which he buys."

III. It may be conceded a majority of the decisions before 1916 held antitrading stamp laws were not a proper exercise of the police power and violated rights guaranteed by the 14th Amendment to the Federal Constitution. As indicated in Division I hereof most of these cases were decided when it was thought the police power was much more limited in scope than is now accepted. See State v. Pitney, supra, 79 Wash. 608, 140 P. 918, Ann. Cas. 1916A 209, 212; State v. Wilson, 101 Kan. 789, 168 P. 679, 681, L. R. A. 1918B 374; State v. J. M. Seney Co., 134 Md. 437, 107 A. 189, 192, 193. State v. Pitney and State v. J. M. Seney Co. each overrules an earlier decision holding antitrading stamp legislation invalid.

The annotation in 26 A. L. R. 707, 708, on "Constitutionality of trading stamp legislation" says: "An important change, however, in the attitude of the courts toward such legislation occurred in 1916, when the Federal Supreme Court, in the case of Rast v. Van Deman & L. Co. (1916) 240 U. S. 342, 60 L. Ed. 679, L. R. A. 1917A, 421, 36 Sup. Ct. Rep. 370, Ann. Cas. 1917B, 455, sustained the validity of a statute imposing a license tax on merchants using trading stamps, even though the legislation might be of a prohibitive character; and this decision has been followed in other cases in that court."

11 Am. Jur., Constitutional Law, section 281, page 1042, states: "The courts in the several jurisdictions differ greatly in their attitude toward the validity of laws restricting the issuance of trading stamps as a device to further sales of merchandise, and *authority on this question is fairly well divided, although many of the recent cases sustain such legislation.*" (Emphasis added.)

Rast v. Van Deman & Lewis Co., Tanner v. Little, and Pitney v. State of Washington, all supra, hold antitrading stamp statutes there considered do not violate either the due process clause or the equal protection clause of the 14th Amendment. As previously pointed out these decisions are conclusive upon us. Consequently we are bound to hold our statute does not violate section 1 of the 14th Amendment.

The due process clause of the 14th Amendment is identical with Article I, section 9, of our state Constitution which plaintiff alleges and the majority obviously feels our statute violates. We have repeatedly pointed out that the equality or uniformity provision (Article I, section 6) of our state Constitution is the same in substance and effect as the equal protection clause of the 14th Amendment and if a statute does not offend against one of these provisions it is inoffensive to the other. Dickinson v. Porter, 240 Iowa 393, 400, 35 N.W.2d 66, 72, certiorari denied 338 U. S. 843, 70 S. Ct. 88, 94 L. Ed. 515; Vilas v. State Board of Assessment and Review, 223 Iowa 604, 612, 273 N.W. 338; Duncan v. City of Des Moines, 222 Iowa 218, 227, 268 N.W. 547; Berg v. Berg, 221 Iowa 326, 331, 332, 264 N.W. 821; State v. Fairmont Creamery Co., 153 Iowa 702, 705, 706, 133 N.W. 895, 42 L. R. A., N. S., 821; McGuire v. Chicago, B. & Q. R. Co., 131 Iowa 340, 348, 108 N.W. 902, 33 L. R. A., N. S., 706.

Thus the majority indicates our statute is a violation of the due process provision of our state Constitution although the highest court in the land has held statutes similar in principle (at least on that point) do not violate an identical provision of the Federal Constitution. And the majority squarely holds the statute violates Article I, section 6, Iowa Constitution although the Federal Supreme Court has held statutes not unlike ours in effect do not violate a similar provision of the 14th Amendment. This is most unsatisfactory, if not anomalous, especially since there is no Iowa decision that conflicts with those of the supreme court. It is obvious our statute violates both Constitutions in the respects indicated or it violates neither one.

In Des Moines J. S. L. Bank v. Nordholm, 217 Iowa 1319, 1335, 253 N.W. 701, it was claimed a statute violated the contract clause (Article I, section 21), Iowa Constitution, although the Federal Supreme Court had held a similar Minnesota statute did

not violate the contract clause (Article I, section 10) of the United States Constitution. See Home Bldg. & Loan Assn. v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481. We upheld the statute. This from the opinion (page 1335 of 217 Iowa) is persuasive here:

"There is no doubt that this court has the power, in interpreting the Constitution of Iowa, to reach a conclusion on the contract clause different from that reached by the Supreme Court of the United States when interpreting a similar clause of the Federal Constitution; * * *.

"But assuming that to be true, good policy and a desired consistency between the two Constitutions rather dictate that the interpretation of the two clauses be similar. Such consistency in interpretation will accomplish consistency in operation. Uniformity in the construction of these contract clauses is most desirable, if not absolutely necessary."

The annotation above referred to in 26 A. L. R. 707, 710, 711, says upon this very question: "It seems desirable that there should be harmony of judicial interpretation so far as similar constitutional provisions are concerned, and that the grounds of the Federal Supreme Court decisions should be recognized as valid in construing provisions of state constitutions similar in effect to the provisions of the Federal Constitution involved in those cases."

21 C. J. S., Courts, section 205, page 363, states: "* * * where the question presented is as to the construction or violation of a provision of the state constitution which is similar to a provision of the federal constitution, and the same question has been decided by the federal supreme court with respect to the federal constitution, the federal decision is strongly persuasive as authority, and is generally acquiesced in by the state courts, although it is not absolutely binding." To like effect is 11 Am. Jur., Constitutional Law, section 105.

The majority completely ignores these considerations. Apparently it is under the misapprehension that these decisions of the United States Supreme Court in the trading stamp cases are no more persuasive than precedents of other state courts. The rule is they are strongly persuasive. I think they should be followed.

IV. The majority's Division IV holds our statute lacks equality in the constitutional sense because it does not prohibit the issuance of trading stamps to be redeemed by dealers who issue them. It may be conceded the legislature might well have so extended the scope of the statute or even that it should have done so. But doubtless for reasons it deemed sufficient it did not see fit to so extend the law. It was under no constitutional compulsion to do so.

Such a statute as ours is not unequal in the constitutional sense because it is not all-embracing, does not apply a complete remedy to an existing evil, or prohibit other conduct which cannot be distinguished in kind from that prohibited. If the majority's reasoning were followed to its logical conclusion countless police regulations would be held unconstitutional as not uniform.

"It is well settled that the legislature of a State may (in the absence of other controlling provisions) direct its police regulations against what it deems an existing evil, without covering the whole field of possible abuses [citations]." Farmers & Merchants Bank v. Federal Reserve Bank, 262 U. S. 649, 661, 43 S. Ct. 651, 656, 67 L. Ed. 1157, 1164, 30 A. L. R. 635, 644. To the same effect are Patsone v. Commonwealth of Pennsylvania, 232 U. S. 138, 144, 34 S. Ct. 281, 282, 58 L. Ed. 539; Zucht v. King, 260 U. S. 174, 177, 43 S. Ct. 24, 25, 67 L. Ed. 194, 198 (" * * * regulation is not violative of the equal protection clause merely because it is not all-embracing.") ; Madison Metropolitan Sewerage Dist. v. Committee on W.P., 260 Wis. 229, 50 N.W.2d 424, 438.

"If the legislature shares the now prevailing belief as to what is public policy and finds that a particular instrument of trade war is being used against that policy in certain cases, it may direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, *and it may do so none the less that the forbidden act does not differ in kind from those that are allowed* [citations].

" * * * If a class is deemed to present a conspicuous example of what the legislature seeks to prevent, the Fourteenth Amendment allows it to be dealt with *although otherwise and merely logically not distinguishable from others not embraced in the law* [citation]." (Emphasis added.) Central Lbr. Co. v. South

Dakota (Holmes, J.), 226 U. S. 157, 160, 161, 33 S. Ct. 66, 67, 57 L. Ed. 164, 169.

See also Ed Schuster & Co. v. Steffes, 237 Wis. 41, 55, 295 N.W. 737, 743, 133 A. L. R. 1071.

Substantially the same language is quoted with approval from Carroll v. Greenwich Ins. Co., 199 U. S. 401, 26 S. Ct. 66, 50 L. Ed. 246 (involving an Iowa statute applicable only to fire insurance companies), in State v. Fairmont Creamery Co. (Evans, J.), 153 Iowa 702, 713, 133 N.W. 895, 899, 42 L. R. A., N.S., 821: "If an evil is specially experienced in a particular branch of business, the Constitution embodies no prohibition of laws confined to the evil, or doctrinaire requirement that they should be couched in all-embracing terms."

Further, I think the majority's holding that our statute classifies merchants into two classes—those who issue trading stamps redeemed by others and those who issue stamps redeemed by themselves—is fallacious. The prohibition of the law applies to everyone. None may issue stamps to be redeemed by others by gifts or premiums except upon the conditions stated in the Act. There is no unconstitutional discrimination in this. See Ed Schuster & Co. v. Steffes, supra, 237 Wis. 41, 55, 295 N.W. 737, 743, 133 A. L. R. 1071.

State ex rel. Welsh v. Darling, 216 Iowa 553, 555, 246 N.W. 390, 391, 88 A. L. R. 218, the only Iowa decision the majority opinion cites, is a typical case dealing with classification for legislative purposes. It bears no resemblance to the present controversy. It involves a 1931 statute applicable "only to cities now or hereafter having a population of 125,000 or more." As a practical matter the law has applied only to Des Moines. We held the law meets all constitutional requirements of uniformity.

Even where legislation makes a classification, "logical appropriateness of the inclusion or exclusion of objects or persons is not required." Heath & Milligan Mfg. Co. v. Worst, 207 U. S. 338, 354, 28 S. Ct. 114, 119, 52 L. Ed. 236, 244.

I am not convinced the legislature could not in effect prohibit use of trading stamps redeemable by others pursuant to a previous "contract arrangement or scheme" without forbidding issuance of all trading stamps. Just what considerations may have induced the lawmakers to enact the law in its present form

we do not know. However, it is not necessary that we find facts existed which justified the legislation.

If any conceivable state of facts will sustain the law we are bound to presume such condition existed. See Tolerton & Warfield Co. v. Iowa State Board of Assessment and Review, supra, 222 Iowa 908, 914, 270 N.W. 427, citing with approval Rast v. Van Deman & Lewis Co., supra, 240 U. S. 342 (see page 357); McGuire v. Chicago, B. & Q. R. Co., 131 Iowa 340, 350, 108 N.W. 902, 33 L. R. A., N.S., 706 (citing Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77); Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 78, 31 S. Ct. 337, 55 L. Ed. 369, 377, Ann. Cas. 1912C 160; State v. Pitney, supra, 79 Wash. 608, 140 P. 918, Ann. Cas. 1916A 209, 211.

"Further, it is plaintiff's burden to negative every conceivable basis which may support this statute [citations]." Dickinson v. Porter, supra, 240 Iowa 393, 399, 35 N.W.2d 66, 71.

It is not necessary that the evils the legislature believed justified the enactment of the law actually did exist so long as its belief was not purely arbitrary. Tanner v. Little, supra, 240 U. S. 369, 385, 36 S. Ct. 379, 60 L. Ed. 691, 702, and citation. If there is any reasonable ground for a difference of opinion as to the existence of such evils the determination of the lawmakers thereon is final. State v. Wilson, supra, 101 Kan. 789, 168 P. 679, 684, L.R.A. 1918B 374. To like effect is State v. Fairmont Creamery Co., supra, 153 Iowa 702, 707, 133 N.W. 895, 42 L.R.A., N.S., 821.

"It is the duty and function of the legislature to discern and correct evils, and by evils we do not mean some definite injury but obstacles to a greater public welfare [citations]." Rast v. Van Deman & Lewis Co., supra, at page 357 of 240 U. S., page 374 of 36 S. Ct., page 687 of 60 L. Ed.

These are some of the considerations which may have persuaded the legislature to forbid, in effect, the issuance of trading stamps redeemable by others, pursuant to previous arrangement or scheme:

Such a plan presents such a conspicuous example of what the legislature regarded as an evil as to justify special treatment. (See State v. Fairmont Creamery Co., supra, at page 713 of 153

Iowa.) The injurious effect upon the public of the issuance of trading stamps to be redeemed by others is much greater and more prevalent than where redemption is by the individual dealer. The seductive effect of the stamps is increased where redemption is made by a third party from a special line of premiums rather than from the merchant's general stock. State v. Wilson, supra, 101 Kan. 789, 168 P. 679, 684, L.R.A. 1918B 374. Legislation of this kind may make distinctions depend upon the degrees of evil without being arbitrary or unreasonable. Heath & Milligan Mfg. Co. v. Worst, supra, 207 U. S. 338, 355, 28 S. Ct. 114, 119, 52 L. Ed. 236. See also State v. J. M. Seney Co., 134 Md. 437, 107 A. 189, 193; State v. Wilson, supra.

But there is a difference in kind as well as of degree in the conduct prohibited. It may reasonably be thought issuance of stamps procured from and redeemed by another engaged in that business leads to monopolistic tendencies that do not exist where the stamps are furnished and redeemed by the dealer. The former plan tends to concentrate business in those who utilize it and to give them an undue advantage over their competitors to the latter's injury. Then a so-called company stamp plan might practically be forced upon unwilling dealers by threats of loss of trade if they do not "sign up." There is substantial support in the evidence for this consideration. The majority's suggestion that business houses generally or wholesalers in particular resort to like acts of coercion, if true, is wholly immaterial on the issue of uniformity of this statute.

When this law was passed the legislature may have concerned itself with the increased cost of living and sought means of combatting it. Under plaintiff's plan and those like it the merchant is compelled to pay three per cent of his receipts to a middleman who in turn redeems such stamps as are saved and presented with premiums of an average retail value of 2.08% of the cost of the merchandise for which the stamps were issued.

As stated in District of Columbia v. Kraft, 35 App. D. C. 253, 269, 30 L.R.A., N.S., 957, 965, and followed in State v. Wilson, supra, at page 804 of 101 Kan., page 686 of 168 P.: "An entirely unnecessary middleman, for his own profit solely, has injected himself between the regular merchant on the one hand,

and his customers on the other. * * * We have then this large sum of money annually taken from the merchant and his customers, and added to the gross cost of living of all the people of the District, without return. Is it not for the public welfare * * * to prohibit such an undertaking? We think that it is."

And this from State v. Wilson, supra, must be kept in mind: "One may regard these arguments by which the objectionable character of the trading stamp business is sought to be established as unsound, and still hesitate to say with confidence that they are not fairly debatable—that their acceptance is inconsistent with a fair consideration of the subject by a reasonable mind." (Page 805 of 101 Kan., page 686 of 168 P.)

The majority says, "The legislature has no general power to pass laws dispensing with a 'middleman.'" Throughout its existence this court has repeatedly pointed out the unsoundness of such an approach to the question of constitutionality of legislation. McMillen v. County Judge (1858), 6 (Clarke) Iowa 391, 394, states: "The true inquiry, however, is, whether the exercise of the power is inhibited. In ascertaining the power of the legislature under the constitution, we look not to what the instrument authorizes to be done, but to what is prohibited." Our decisions on this subject are carefully reviewed in Knorr v. Beardsley (Bliss, J.), 240 Iowa 828, 842-845, 38 N.W.2d 236, 244, 245, which quotes this with approval from Dickinson v. Porter, supra, 240 Iowa 393, 399, 35 N.W.2d 66, 71: "We have pointed out repeatedly the General Assembly has power to enact any kind of legislation it sees fit provided it is not clearly and plainly prohibited by some provision of the State or Federal Constitution."

The conclusion herein reached that Code sections 553.15 to 553.18 do not violate the equality or uniformity provision of our state Constitution or its equivalent, the equal protection clause of the 14th Amendment, finds special support from State v. Wilson, supra, 101 Kan. 789, 168 P. 679, 684, L.R.A. 1918B 374; State v. J. M. Seney Co., supra, 134 Md. 437, 107 A. 189, 193; State ex rel. Sperry & Hutchinson Co. v. Weigle, 166 Wis. 613, 166 N.W. 54, Ann. Cas. 1918D 707; Ed Schuster & Co. v. Steffes, supra, 237 Wis. 41, 295 N.W. 737, 743, 744, 133 A.L.R. 1071, 1080, 1081; Lansburgh v. District of Columbia, 11 App. D.C. 512; District of Columbia v. Kraft, 35 App. D.C. 253, 30 L.R.A., N.S., 957.

38

Since the majority confines its actual decision to the point of claimed lack of uniformity I do not cite a number of precedents that could be added to those just mentioned which hold antitrading stamp legislation does not violate due process.

I would reverse.

THOMPSON and LARSON, JJ., join in this dissent.